## SAMUEL HENSHAW & another *vs.* BANK OF BELLOWS FALLS.

A railroad corporation, empowered by law to mortgage their franchise and property, after making a mortgage of all their lands, franchise and privileges, and "all the locomotive engines, cars and other articles of personal property whatsoever, now owned or used by the corporation, or which they may hereafter own or use," authorized their directors to issue bonds to the amount of $1,200,000 to pay debts contracted in building and furnishing their road, and to secure such bonds by "an additional or second mortgage of the road, franchise and property of every description, including cars and engines," subject to the first mortgage, and "as full and complete" as that. Pursuant to this authority, bonds were issued, and a second mortgage made of all the lands, franchise and privileges of the corporation, "and the property and premises whatsoever, mentioned, specified, described or referred unto in the" first mortgage. *Held,* that the second mortgage, as against a subsequent attachment, conveyed engines and cars acquired by the corporation after the first and before the second mortgage.

The objection that one of the plaintiffs in an action brought by trustees had not accepted the trust at the date of the writ cannot first be taken at the argument before the full court upon the report of one of the judges.

The president of a railroad corporation, authorized by vote of the corporation to execute and deliver, and "do and perform all other acts and things necessary to give validity and effect to" a mortgage of the road, franchise and property of the corporation to trustees for the benefit of bondholders, executed, upon the eve of the failure of the corporation, a deed of surrender of the whole road and property to the trustees, who, upon the failure of the corporation, took possession of the road and property, and afterwards kept exclusive management and control thereof. *Held,* that the trustees thereby obtained and kept actual possession of the property, as against subsequent attaching creditors; although the laws of the State required not only delivery, but continuous and exclusive possession of the grantees, to perfect such a title; and although the trustees continued to employ in the management of the road the same persons who had been employed by the corporation; and although the mortgage provided that the trustees should permit the corporation to retain the exclusive use and possession of the property until some default in paying the principal or interest of the bonds, which had not yet occurred.

In an action for attaching property on mesne process against a third person, which remains in the plaintiffs' possession after the attachment and until judgment and execution, the measure of damages is the value of the property at the time of its being taken on execution.

ACTION OF TORT by Samuel Henshaw and William Raymond Lee, trustees under a second mortgage of the Rutland and Burlington Railroad, for the conversion of five locomotive engines, and the tenders and tools used about them, four passenger cars, and other chattels, formerly belonging to the railroad corporation and alleged to be the plaintiffs' property. Writ dated February 4th 1854. Trial at November term 1856 before

*Thomas,* J., who reported the case for the consideration of the full court.

*S. Birtlett & J. P. Putnam,* for the plaintiffs.

*R. Choate, B. R. Curtis & S. E. Sewall,* for the defendants.

MERRICK, J. This suit is prosecuted to recover the value of the locomotive engines, tenders, passenger cars and other articles enumerated in the writ. It is agreed that all these articles were formerly owned by the Rutland and Burlington Railroad Company, a corporation having its charter from the legislature of the State of Vermont. Both of the parties to the present suit derive the right and title upon which they respectively rely from that company. The defendants having obtained an execution against them upon a judgment rendered in a court of competent jurisdiction in the State of Vermont, caused the locomotive engines and other articles now in controversy, the same having been previously attached on mesne process, to be seized and sold thereon in satisfaction of the same. But the plaintiffs contend that, prior to the time when the attachment in that suit was made, they had acquired a right to all this property, which could not lawfully be interfered with or disturbed by the defendants. The attachment in their suit against the railroad company was made on the 31st of January and the 1st of February 1854, and the instrument of conveyance under which the plaintiffs claimed to derive their title was executed on the 1st of August 1853. If therefore that instrument was of legal validity and did by its terms transfer and convey the property and chattels now in question to the plaintiffs, and if they thereupon did whatever was necessary by the laws of the State of Vermont, where the instrument was executed, and where the property which it purported to convey was situate, to perfect in them a good and complete title as against all subsequent purchasers and attaching creditors, it is obvious that the plaintiffs are entitled to prevail in this action; because, being prior in point of time, their right is paramount to any which could be exercised by the defendants under their writ of execution.

By the laws of the State of Vermont " every railroad corporation shall have power to issue their notes or bonds for the pur-

48 *

pose of building or furnishing their roads, or paying any debts outstanding for building or furnishing the same, bearing such a rate of interest, not exceeding seven per cent., and secured in such manner, as they may deem expedient." Compiled Sts. *c.* 194, § 13. At a meeting of the stockholders of the Rutland and Burlington Railroad Corporation, held on the 8th of June 1853, authority was given, by resolutions duly adopted, to the directors of the company to issue bonds, obligations or promissory notes, at their discretion, to an amount not exceeding twelve hundred thousand dollars, bearing interest at a rate not exceeding three and one half per cent. semiannually, to be applied in payment of debts contracted in building and furnishing their road. And in like manner further authority was given them to secure the payment of all the bonds, notes and obligations which should thus be issued, by executing to such persons as they should select as trustees, in trust for the use and benefit of the holders of those bonds, notes and obligations, "an additional or second mortgage of the road, franchise and property of every description, including cars, engines, station houses and wharves." This was, by the terms of the vote, to be subject to the first mortgage which had been made by the company, and to be made "as full and complete, with like reservations," as that mortgage. The president of the corporation was also authorized to execute, acknowledge and deliver the mortgage, and (which it may be material hereafter particularly to consider) "to do and perform all other acts and things necessary to give validity and effect to said conveyance."

In pursuance of the authority thus vested in the president and directors of the corporation, bonds to a large amount were issued, and the indenture of two parts bearing date the 1st of August 1853, reciting the votes by which these powers had been conferred, was duly executed by and between the corporation of the first part and Samuel Henshaw and Joshua Thomas Stevenson of the other part.

The counsel for the defendants were not, at the argument of this cause, disposed to deny, and we think they were perfectly right in admitting with candor that it could not fairly be denied,

that it was the purpose of the legislature to enable railroad cor-
porations to mortgage their franchises and property, even though
the effects of such a mortgage would be, when foreclosed, to de-
prive the corporation of the necessary means to perform their
corporate duties to the public. And no suggestion is made of
any irregularity or of any want of due formality in the execu-
tion of the deed of indenture of the 1st of August, the object
and purpose of which were to afford security for the payment
of the bonds and obligations which the directors had issued and
proposed to issue in pursuance of the resolutions adopted at
the meeting of the stockholders.

The authority of the directors to cause to be executed the
indenture of the 1st of August is thus proved; and that instru-
ment having been in fact executed with all due formality, the
first question which arises has relation to the particular articles
of property it purports to convey. It is conceded by the plain-
tiffs that of the several articles enumerated in their writ, three
of the locomotive engines and one of the cars were not owned
by the railroad corporation when the first indenture of mortgage
was executed; and the defendants therefore deny that these
passed to the plaintiffs by the second indenture. This last men-
tioned instrument conveys to the persons therein named as
trustees " all the lands, buildings, tenements, hereditaments,
franchise, road, rights, easements, immunities and privileges
whatsoever, and the property and premises whatsoever, men-
tioned, specified, described or referred unto in the indenture first
before mentioned," that is, in what is termed the first mort-
gage deed. On recurring to that deed to which the description
in the indenture of the 1st of August 1853 refers, it is seen that
it purports and professes to convey not only the lands, franchise,
and privileges of the corporation, but also " all the locomotive
engines, cars, machinery, tools, implements, utensils and other
articles of personal property whatsoever, now owned or used by
the corporation, or which they may hereafter own or use." Now
it may be considered very certain, as matter of law, that this
instrument did not and could not operate at all as an instrument
of conveyance of personal property not then in existence or not

then owned by the corporation. *Barnard* v. *Eaton,* 2 Cush. 294. *Codman* v. *Freeman,* 3 Cush. 306. But it may be considered equally certain, as matter of fact, that it was the intention of the corporation, or of those of its officers by whom the deed was executed, that it should have that effect and operation; and that after acquired personal property of the kind there mentioned should, equally with that then in existence and owned by the grantor, be thereby transferred to the grantee. Subsequently acquired personal property, such as locomotive engines and cars, is there very clearly and distinctly referred to. And by the indenture of the 1st of August 1853 the corporation convey, in direct terms, not only all the personal property " mentioned," but also all that which is " referred to " in the first indenture. When the circumstances under which the second indenture was made, and the objects and purposes of it are considered; that there was then outstanding a first mortgage to protect the creditors of the corporation in relation to any large sums of money in which they stood indebted; that the amount of the notes and bonds which were to be issued under the security of this second indenture might reach the sum of twelve hundred thousand dollars; it is obvious that the words of conveyance used in it were intended to cover all the available property which was, or which might be, in the possession of the corporation. As it purported to convey all locomotive engines and cars referred to in the former mortgage, and as that mortgage did in the most distinct manner refer to subsequently acquired property of this kind, we think that upon a true construction of its language, those three locomotive engines and one car acquired by the corporation after the execution of the first passed to the grantors under the second indenture.

But the defendants now object that whatever passed to the grantees under the indenture of the 1st of August, no action can be maintained by the present plaintiffs for the unlawful conversion by the defendants of any portion of the property thereby conveyed, because at the time of the alleged conversion Mr. Lee, though he had been duly appointed a trustee in the place of Mr. Stevenson before, did not actually accept and take upon him-

self the trust until after, the attachment made by the defendants of the property in question on their writ against the railroad company. To this objection the plaintiffs reply, and we think their reply is a sufficient answer, that it is not open to them upon the report. No such question as that was reserved at the trial. The report expressly states that no objection was raised to the evidence offered by the plaintiffs, except those particularly specified; and the question which arises upon the objection now urged is neither an objection to evidence, nor is it anywhere to be found mentioned among those reserved for the consideration of the full court. It ought not therefore now to be allowed. It is easy to see that if the objection had been taken at the trial, it might have been readily disposed of by the introduction of evidence showing that in fact Mr. Lee accepted the trust at an earlier date than that mentioned in the written memorandum which is in the case. Or, if necessary, an amendment which would have obviated the objection might have been granted without affecting in the least degree the merits of the case. Without therefore determining whether any effect would or ought to have been given to this objection, if, upon the evidence reported, it was properly or in fact before us, it seems clear that, no such question being reserved or intended to be reserved in the report, it is matter upon which we are not called upon to pass, and of which the defendants cannot now avail themselves.

But the further question, whether under the indenture of the 1st of August 1853 the personal property which it purported to convey was actually delivered to the grantees and afterwards remained in their open, visible and exclusive possession, is more elaborately considered and discussed in the written arguments of the counsel than any other which arises upon the report of the case. But upon the facts there disclosed it does not seem difficult of solution. The authorities to which reference is made in those arguments, the citations of which need not here be repeated, show very conclusively that, by the laws of the State of Vermont, the conveyance of personal chattels by deed of mortgage, bill of sale, or any other instrument, to be held in trust

by the vendee or grantee as security for the payment of a debt due to him, will not avail against a subsequent attachment thereof, unless he has previously thereto obtained a delivery of the chattels and has thenceforward been in the open, visible and exclusive possession of the same.[*]   In conformity then to this rule, which must be regarded as absolute and inflexible, the burden of proof is upon the plaintiffs to establish the truth of this general proposition ; that they did, before the attachment made by the defendants, obtain the possession of the personal property conveyed to them by the Rutland and Burlington Railroad Company, and did afterwards constantly remain in the open, visible and exclusive possession of it.   And it appears to us that, upon a consideration of the facts stated in the report, that burden is fully sustained, and that the truth of this proposition is a just and necessary consequence from the evidence in the case.

The deed of indenture was executed on the 1st of August 1853.   The grantees did not then take possession of any part of the mortgaged property, but the whole of it remained in the possession of the grantors until the 19th of November then next following.   On that day the railroad company stopped payment ; and since that time no business pertaining to the running of trains, the transportation of passengers or freight upon the road, or the care, custody and management of the engines, cars and other mortgaged property, has been transacted by any person in the employment or under the control or direction of the corporation or of any persons acting as their officers.   Yet all this property was afterwards in constant use, and was employed by the persons who then had it in custody, just in the same manner as it had been before by the corporation, in the transportation of passengers and freight.   But if this business was done in fact, and

---

[*] Upon this point the plaintiffs relied on *Kendall* v. *Samson*, 12 Verm. 515 ; *Hall* v. *Parsons*, 17 Verm. 271 ; *Coty* v. *Barnes*, 20 Verm. 78 ; *Stephenson* v. *Clark*, 20 Verm. 624 ; *Hutchins* v. *Gilchrist*, 23 Verm. 87, and cases cited ; *Burrows* v. *Stebbins*, 26 Verm. 659 ; and the defendants, on *Tobias* v. *Francis*, 3 Verm. 425 ; *Woodward* v. *Gates*, 9 Verm. 358 ; *Sturgis* v. *Warren*, 11 Verm 433 ; *Russell* v. *Fillmore*, 15 Verm. 130 ; *Skiff* v. *Solace*, 20 Verm. 279.

none of it was done by the corporation, or by any of their officers, or by any persons under their direction — and this must be taken as an indisputable fact, since it may be said, without qualification, that it is shown to be so by all the evidence in the case — the inquiry necessarily arises by whom else was it done, and who had possession of the property. These inquiries it is not difficult to answer.

On the 16th of November 1853, Mr. Lee, as the president of the corporation, in pursuance of a vote of the directors at a meeting held by them on the same day, executed with Messrs. Henshaw and Stevenson, the grantees and trustees under the deed of indenture of the first of August, a further deed of indenture, whereby the mortgaged property was surrendered and yielded up to them, to be held solely for the uses and purposes for which it was conveyed. It is insisted by the counsel for the defendants, that this whole proceeding was unwarrantable and illegal; that the vote of the directors was invalid, because it was adopted at a meeting held at a place beyond the jurisdiction of the state under which the corporation held their charter; and that the act proposed thereby to be done was beyond their power or right to authorize. But whether this should so be determined was a matter of law or not, it is indisputable in point of fact, that the deed of surrender, as it is called, was then executed by the parties; and that three days afterwards, to wit, on the 19th of November, Messrs. Henshaw and Stevenson proceeded to take possession of all the mortgaged property of every description. They appointed an agent to act for them in that behalf; and he went, under their special and written directions, to every place where any of this property was then situate or to be found, and took possession of it for them, and gave notice thereof in writing to every individual who had charge of any part of it. From that time forward the trustees had the exclusive control in the management of all the business over the road The persons performing every species of labor upon or with it were in their employment, hired and paid by them, and subject to their control. This state of things remained unchanged until after the defendants made their attachment of the property now

in controversy. And thus it appears that the corporation were not then in possession of the property at all, but that the grantees had the sole, open, visible and exclusive possession of it under a claim of right, which claim was acquiesced in as indisputable by the grantors.

This meets the requirements of the law. The mortgaged property was in fact delivered to the mortgagees ; they retained the possession of it, and applied it to the uses for which they were to hold it in trust. The objection that the agents and servants, whom they employed to take care of, manage and use the property, were the same persons who had been for the like purposes employed by the corporation, before the surrender and delivery of it, is wholly immaterial, and can in no way affect the rights of the parties. The trustees were obliged to employ suitable and proper persons to keep, take care and manage the machinery, cars and every other species of property, for which, coming into their possession, they were to be and remain accountable. For this purpose they had a right to employ whomsoever they pleased. If they did in fact employ those who had before been in the service of the company, they were not thereby any less in the actual possession of the property, than if they had sought for and procured the labor and services of other individuals. It is said that by this course of proceeding the public were not as effectually notified of the change of possession as they might have been. This is perhaps to some extent true, but less we think than upon first view might be supposed. How have the public any effectual means of determining at any particular time in whose employment are the persons seen in the performance of labor or service upon a railroad, except by the institution of inquiries in the proper quarter ; by seeking information directly from one or the other of the parties to the contract ? If that had been done by anybody after the change which took place under the direction of the trustees, it would at once and immediately have been known, for it is not pretended that there was any designed, intentional or actual concealment. The only ground upon which the defendants insist that there was no change of possession is, that the publicity of it by the adoption

of means other than those which were resorted to might have been greater or more distinctly diffused. But this extended publicity is no requisite of the law. It is enough, and all that is necessary to protect his rights against subsequent purchasers or attaching creditors, that the mortgagee has in fact obtained possession of the mortgaged property, and has afterward continued to be in the open, visible and exclusive possession of it for the uses and purposes for which it was transferred to him.

By the vote of the stockholders of the Rutland and Burlington Railroad Company at their meeting held on the 8th of May 1853, in addition to the other powers conferred on the officers of the corporation respecting the conveyance of its property by a second mortgage deed, the president was expressly authorized to do and perform all acts and things necessary to give validity and effect to the conveyance which the directors were empowered to cause to be executed. The great object and purpose of the corporation in that conveyance cannot, either in consideration of the terms in which it is expressed, or of the resolutions under which its officers were empowered to act, be mistaken. It was to give security to the creditors of the grantor, and ample power was conferred on the officers of the corporation to do, in their respective stations, whatever was essential to accomplish that object. It is true that the grantees were to hold the property conveyed to them in trust, among other things, for the use of the grantors until there should be a failure to pay some portion of the principal or interest of the debt to recover which the property conveyed was pledged. But special authority had been given to the president to make this conveyance to the trustees effectual to the security of the creditors, by doing all acts requisite for that purpose; and as this could be done only by surrendering and delivering up to the grantees possession of the mortgaged property, he had a right, and it may be said that it was his duty, to do that act. The facts proved in the case show that in this particular he conducted himself in good faith. The corporation were on the eve of failure; the creditors intended to be protected by the mortgage could be

*made* secure *only by the* exercise *of the* authority *with which* he had been invested; and he therefore rightfully and properly gave up the possession of the mortgaged property to the trustees. It is immaterial how this was done; it is sufficient that it was done in fact. He having in himself, in his own office, under the specific vote of the corporation, sufficient authority to deliver the property as one of the acts necessary to give effect to the conveyance, and having actually put the grantees in possession of it, it is unnecessary to inquire whether the directors proceeded with regularity, or transcended their authority in the vote which they adopted relative to the deed of surrender. Irrespectively of all their proceedings, the trustees had acquired by the act of the president a perfect title to the property against subsequent attaching creditors. And this is clearly so, notwithstanding the provision in the indenture that the trustees shall hold the conveyed property in trust to suffer and permit the grantors *to retain the exclusive possession, use, management* and control of it until the occurrence of a certain specified default in the payment of some part of the interest or principal of the several debts for the due security of which it was made and executed. For there are other trusts also created by it, the first and leading one of which is, that all the property therein mentioned shall be held and devoted to the security and ultimate payment of these debts. To execute each and all the trusts imposed upon the grantees by their acceptance of the conveyance made to them by the corporation, it was indispensable that they should have, as has already been shown, the actual, open and visible possession of all the personal property conveyed to them; otherwise, the particular trust for the benefit of creditors might be wholly defeated by the interference of subsequent purchasers or attaching creditors. To prevent such consequences and to secure an appropriation of the property, so that it should not be diverted from a faithful application thereof in the execution of the several trusts created by the provisions of the indenture, it was the undoubted right of the grantees to take the property conveyed to them into their own sole and exclusive custody. Whenever the provisions of a contract create an obli-

gation against one of the parties to it in reference to specified property of which it is the subject, he is by necessary implication authorized to do all acts which are absolutely essential to the strict performance of his duty concerning it. If there be conflicting provisions, it is reasonable that those of minor importance should yield to the great and paramount purpose of the parties and to their object and design in its execution. And upon this principle it is apparent that the trustees ought to have taken possession as they did of the mortgaged property. The chief end for which the indenture was executed was manifestly to create a fixed security in behalf of certain distinctly designated creditors of the corporation, and that end could be effectually accomplished only by the course which the trustees pursued. Their possession of the property was therefore a right upon which they might lawfully insist. But aside from this conclusion, it is to be considered, in a controversy between the present parties, that the particular trust assumed by the trustees, to suffer and allow the grantors to remain until the occurrence of a specified contingency in possession of the mortgaged property, was a provision solely and exclusively for their benefit, and of which they only were entitled to take advantage. The plaintiffs have no cause of complaint when the terms of a provision, not made for them or on their account, but wholly for the use or advantage of the corporation, are not strictly observed, if the latter are satisfied and acquiesce in the omission. It will be in sufficient season to determine what are the rights of the *cestuis que trust,* and whether they have been violated, when the party in interest shall interpose objections to the proceedings of the trustees, or seek relief for any injury alleged to have been sustained.

Other questions have been adverted to in the arguments, upon which we have no occasion, in the determination of those upon which the rights of the parties in this case depend, to express any opinion. If in anything the railroad company, or their officers, have failed to perform in behalf of the public the duties required of them by law, proper remedies may no doubt be found ; but nothing of that kind is shown by which the questions at issue in this action are affected.

Henshaw & another *v.* Bank of Bellows Falls.

The plaintiffs being, as has been shown, entitled to recover, it only remains to determine the principle upon which their damages for the unlawful conversion of the property taken by the defendants is to be ascertained. The existence of the first mortgage and the rights of the mortgagees under it present no impediment to the plaintiffs' recovery, because the latter were in the actual possession, and there is no evidence to show that the former ever took any possession whatever of the property. Of course they can prefer no claim to it against the subsequent purchasers. The rule of damages is therefore to be prescribed without regard to any supposed claim on their part. The general principle is, that in actions of trover and trespass for the unlawful conversion of personal property, the owner shall recover the value of it as it was at the time of the first wrongful taking, with interest afterwards from that date. If this rule were here to be applied, the plaintiffs would be entitled to claim the value of the property as it was on the day of the attachment thereof on mesne process, with interest afterwards. But under the particular circumstances of the present case we think that rule is inapplicable ; and that it would be unjust to allow it to be enforced. The plaintiffs did in fact have the full and entire use of the engines, cars and other articles until they were seized by the sheriff on the execution. They are therefore to recover whatever the value of the property shall be ascertained to have been on that day, with interest thereon until the time of entering up the judgment. If the amount for which judgment, according to this rule, is to be entered is not agreed upon by the parties, the cause must be sent to an assessor to ascertain and report it. *Judgment for the plaintiffs.*